VIOLET LAMBERT, a Minor, by MARY LAMBERT, Her Next Friend, v. C. O. JONES, THOMAS H. GEARY, Doing Business as THE GEARY SCHOOL OF DANCING, and the ARMOUR BUILDING COMPANY, a Corporation, Appellants.—98 S. W. (2d) 752.

Division One, November 12, 1936.

*J. Harold Olson* and *Frank H. Backstrom* for C. O. Jones; *Beardsley & Beardsley, J. John Gillis* and *Harry L. Donnelly* for Thomas H. Geary.

*Hipsch & Sadler, Harold Waxman* and *Chas. N. Sadler* for respondent.

HYDE, C.—This is an action for damages for personal injuries. Plaintiff obtained a verdict for $10,000 against all three defendants. From the judgment entered on this verdict, only defendants Jones and Geary have perfected appeals. Plaintiff has recently died and the matter has been revived in the name of Mary C. Lambert, her administratrix. Both appealing defendants assign as error the overruling of their separate demurrers to the evidence at the close of the case and the giving of instructions which authorized a verdict against each of them on both grounds of negligence alleged.

Plaintiff was injured by falling on a stairway and charged as common-law negligence against all defendants insufficient lighting and failure to repair a loose step. Both grounds were submitted as a basis of liability of all defendants. The title to the building was in the Armour Building Company, a corporation. Jones was the president of this company and Geary was one of its tenants. The ground floor of the building was used as a moving picture theater. On the second floor, there were offices occupied by doctors. The whole third floor was rented to Geary, who had conducted a dancing school there, for several years before the Armour Building Company purchased the building. There was a separate entrance from the street for the tenants on the second and third floors. Inside the entrance lobby there was a stairway of six steps going up to a landing between the first and second floors. At the left of this landing there was another landing one step up. From this second landing there was another stairway of thirteen steps, which went to the hallway of the second

floor. In this hallway, there was a door, leading from the balcony of the theater, used for an emergency exit. There was also a hallway leading to the doctors' offices, and about twenty feet back from the top of this stairway (from the street entrance to the second floor) there was a stairway leading to the third floor which, including the landing at the bottom, had fourteen steps.

So far as appears from the record, the stairway never was lighted by the owner of the building but this was done by the tenants. Geary had lights in this stairway which were. operated by a switch on the third floor. These lights were turned on by his switch, and operated through his separate meter. He had two lights on the third floor, at the top of the stairway from the second floor; two on the second floor, at the top of the stairway coming up from the landing between the first and second floors; and one in the entrance lobby. Three nights each week Geary held public dancing classes for which he charged an admission fee. At other times, he rented the hall for public dances and for other public purposes. There was a separate set of lights operated from the doctors' offices with one light in the entrance lobby and a larger one on the second floor near the top of the stairway. When Geary's dance hall was in use the lights operating through his meter were turned on, and when the doctors had patients at night they turned on their own lights, which operated through their separate meter. It was further shown that there were four round windows in the second hallway and an entrance lobby window which let in light from the street lights outside. There was also a red light above the emergency door of the theater in the second floor hallway.

Plaintiff was injured on the night of October 15, 1930, while she was on her way out of the building after attending dancing classes at Geary's hall. She had formerly worked for Geary as a dancing instructor but was attending his dancing school that night as a visitor and to see about working there again. Plaintiff descended safely to the second floor and also from the second floor to the landing between the first and second floors. She fell down the "last flight of stairs right to the door." She said she was just walking naturally, although defendants' evidence was that she was running down the stairs. She said she fell on the second step of this last flight of stairs and "fell all the way down the steps." She said that the step "gave way" with her and tripped her. Plaintiff had been up and down the stairway many times but said she had never noticed any loose steps in the stairway before. Plaintiff had a witness who testified the steps from the landing were shaky. Another witness said "these steps wasn't in good condition; the corners were wore off, so many people have walked up and down, they were in a ragged condition." He also said that there was no mat over them. Another witness

testified that there was a loose board in the stairway from the second floor and that she had fallen on it and sprained her ankle about three weeks before plaintiff fell. She did not definitely locate this as the same step on which plaintiff said she fell. She also said that there were no mats on the stairway at that time. Another witness said that the top of one step "was loose and gave way. . . . The top would come down when you stepped on it." This witness thought "it was the second step above the landing that was loose."

Concerning the light in the stairway, plaintiff said: "You could not hardly see where you were going; you could just see the outline of the steps, . . . it has always been that way." She, however, said- that she did not know how many lights there were in the stairway and did not remember what condition the lights were in. Some of plaintiff's witnesses stated only their conclusion that "the stairway wasn't very well lighted" and that "it was unsafe in the dark the way the stairway was lighted at that time." One of plaintiff's witnesses said :· "You could see the stairway as far as that is concerned . . . there is a light at the entrance down on the street." Another witness said "they didn't have no lights at all there . . . there wasn't nothing but a street light and they didn't give no light hardly at all." She said the steps could be seen "indistinctly." Another witness said that a few days after plaintiff fell "the only bulb that I could see from the stair to the dance hall on the third floor was one small bulb right at the landing. (Third floor?) There was an empty socket right at the entrance; didn't have a light in it." Defendants' evidence was that the stairway was covered with a rubber mat; that bulbs were in all of the light sockets which operated from Geary's meter; and that they were all burning on the night plaintiff was injured. It was also shown that the stairway had been built in 1910, and that no repairs had ever been made up to the time plaintiff fell. Defendants' evidence also showed that the stairs were made with heavy oak boards; that they were so constructed that it was "practically impossible" for the top board of a step "to come loose and slip out;" that the steps were not worn; and that no repairs were needed. About ten months after plaintiff was injured, a new lease of the entire building was made and Geary moved out. Alterations and improvements were made at that time.

The owner of the building having dismissed its appeal, the contentions made here go only to the personal liability of Jones and Geary. We will consider first the question of Geary's liability, and will make a statement of the showing made against Jones in connection with our subsequent discussion of his liability. We hold, however, that the court properly overruled the general demurrers of both Jones and Geary because, as hereinafter shown, there was one properly submissible ground of liability as to each. Was Geary liable for

the defective step? A tenant in full and complete control of premises which he occupies owes the same duty, to persons coming there in the course of business or upon his invitation express or implied, to keep such premises in a reasonably safe condition as he would if he were the owner. [36 C. J. 245, sec. 961; 16 R. C. L. 1095-1097, secs. 613-614; Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 52 S. W. (2d) 839, and cases cited.] The stairway upon which plaintiff fell was the first flight of stairs in the stairway from the street entrance to the second floor. Geary did not occupy any part of the second floor. While the stairway from the second floor to the third floor was used only by him and those coming to his dance hall, the other stairway was also used by patrons of the theater and by patients of the doctors. It was not under Geary's control but under the control of the owner of the building. [McGinley v. Alliance Trust Co., 168 Mo. 257, 66 S. W. 153, 55 L. R. A. 334; Roman v. King, 289 Mo. 641, 233 S. W. 161, 25 A. L. R. 1263; Brewer v. Silverstein (Mo.), 64 S. W. (2d) 289.] Under these authorities, clearly the owner had the duty of safely maintaining this stairway. What duty did Geary have?

In Dierkes v. Wolf-Swehla Dry Goods Co., 210 Mo. App. 142, 243 S. W. 269, in ruling upon a tenant's liability in a similar situation, the St. Louis Court of Appeals quoted Tiffany on Landlord and Tenant, as follows:

"The obligation of a tenant to exercise reasonable care to prevent injuries to third persons by reason of dangerous conditions in connection with the property would ordinarily extend only so far as his control extends, and would not render a tenant of part of a building liable for defects in other parts of the buildings or in the sidewalk in front of the building."

The court, in the Dierkes case, which involved "a common passageway used by all the tenants and which was under the control of the landlord and not a part of the premises leased," held the tenant was not liable for the defective condition of a sidewalk therein, and we agree with its reasoning, thus stated:

"To do so would be to rule that a tenant of a large office building in the city of St. Louis, who rented a room therein for business purposes and who invited its customers there, might be held responsible for injuries received by such customers due to the defective condition of the common hallway, stairways, and elevators which are used by all of the tenants of the building and which are under the control of the owner. Negligence can spring only from *an unperformed duty*. A tenant of a part of a building under such circumstances has no control over the common passageways used by all the tenants and others there by invitation. Such tenant has no right to repair such stairways, passageways, and elevators. Such are in no wise under his control, but are under the control of the owner." (Our italics.)

In this case, the evidence fails to show that Geary had any control of the lower stairway or had ever assumed any obligation to maintain it (except as to lights), and the defect which caused plaintiff to fall was not shown to be an open, obvious or known defect. Apparently, it was a defect which would likely have been discoverable only on inspection and Geary had no duty of inspection. Plaintiff said she had never seen a loose step there, although she had used the stairway many times. We, therefore, hold that Geary was not liable on the ground submitted by Instruction No. 5 that he "negligently caused, allowed or permitted a step on said stairway to be loose and insecure." [See, also, 36 C. J. 246, sec. 965; 1 Tiffany, 790-794, secs. 120-121; L. R. A. 1917C, 389, note; Andrus v. Bradley-Alderson Co., 117 Mo. App. 322, 93 S. W. 872; Hawkes v. Broadwalk Shoe Co. (Mass.), 92 N. E. 1017, 44 L. R. A. (N. S.) 1123; Clarke v. Phelps, 214 N. Y. Supp. 6.]

We hold, however, that it was proper to submit the case against Geary upon negligence in failing to properly light the stairway. He had assumed the lighting of the whole stairway on the nights the public were invited by him to use it to come to his dance hall. The evidence is sufficient to show that his obligation was not merely one to the owner of the building to pay for the electricity used and to furnish the light bulbs, but that it was also to maintain and turn the lights on and keep them on when his dance hall was open to the public. [See Lowery v. Kansas City, 337 Mo. 47, 85 S. W. (2d) 105, l. c. 110.] By assuming this obligation, which he apparently thought was necessary when his dance hall was open to the public, a duty was created which he owed to the public to exercise ordinary care to keep his lights in good working order. It was, therefore, his duty to see that they were turned on, at such times, so that the stairway would be lighted sufficiently to make it reasonably safe for the public to use it on the occasions when he invited them to do so for the purpose of coming to his dance hall. Failure to furnish sufficient light on such occasions would be negligence because such a failure would be "an unperformed duty" owing to his invitees. There was evidence which would warrant a finding of negligent failure to perform this duty, as submitted by Instruction No. 6, but since the case was also submitted to the jury on Instruction No. 5, authorizing a verdict against Geary on a charge of negligence upon which he was not liable, the judgment against him cannot stand. The case must be remanded for trial of the issue of whether or not he was negligent in the matter of lighting the stairway.

As to the personal liability of Jones, the evidence, which was the testimony of Jones himself, showed that his occupation was "a builder;" that he built this building in 1910 and later sold it; that the Armour Building Company bought this building at a foreclosure

sale in July, 1930, that his office was also the office of this corporation; and that he was president of this corporation. It was also shown that the company employed a janitor who cleaned the hall and stairway every day. Jones testified further, as follows:

"Q. You were manager of or in charge of it in any way? A. I was looking after it. . . . Q. But you had charge of the rentals and looking after the building, didn't you, Mr. Jones? A. Yes, sir. . . . Q. When was it that you assumed charge of the building as agent and manager with reference to the fifteenth of October, 1930? A. I don't know; sometime along the first of August or latter part of July. . . . Q. When, with reference to the fifteenth of October, did you inspect the stairway or go over it yourself? A. I believe I looked at the stairway—I never looked at them particularly since we took it over. We never looked at them as to whether they needed repairs. . . . Q. As president of that company have you also had charge of that building? A. Yes, sir. . . . Q. Did you ever visit this building? A. Many times. . . . Q. The Armour Building Company still owns that building and operates it? A. Yes, sir. Q. And you are president and as such in charge? A. Yes, sir. Q. And if there is any complaint brought in is it the custom of your office to notify you about it? A. Yes, sir. Q. And any of the employees have that instruction? A. Yes, sir. Q. And they did have at this time? A. Yes, sir. . . . Q. And you took charge of it right away after (foreclosure) for the Armour Building Company? A. For the Armour Building Company. Q. Did you go out and inspect that personally at any time between that time and the 15th of October? A. Well, I go out there two or three times a week. I made no personal inspection except I would go up and down the stairway."

We think this evidence, although somewhat general and indefinite, was sufficient to make a submissible case of liability against Jones for allowing the stairway to be in a condition which was not reasonably safe for public use by permitting a loose and insecure step to remain there without repairs after he could have known of such condition by the exercise of ordinary care. He would not be personally liable therefor merely because he held the position of president of the corporation that owned the building. What would be required to make him liable would be his assumption of complete and exclusive control of this building as manager thereof. It is at least a reasonable inference from his testimony that he did have such management and control. At least, it is apparent from this record that a more definite showing as to this can be made at another trial. An illustrative case as to this situation is Murray v. Cowherd (Ky.), 147 S. W. 6, 40 L. R. A. (N. S.) 617. Defendant there was president of an incorporated telephone company. He was also its general manager, "had at com-

mand its supplies," and "customarily discharged the duties of inspection and maintenance." Inspection of poles was one of these duties "and when an inspection disclosed the unsound condition of a pole he would cause it to be broken out and reset." Plaintiff was injured by a pole falling upon him as he was driving along a public road. It was shown that defendant had "inspected that particular pole one week before it fell" and that its "decayed condition could have been seen had he gone to it and looked at the foot of it." Defendant was held personally liable because of his failure to make a reasonably careful and proper inspection by which he could have discovered the defective condition. The court said: "It is not his position of service, but his relation as an individual wrongdoer to the party injured, which fixes his liability."

It is contended here, as it was in the Murray case, that Jones would not be liable in any event because his failure to inspect, discover, and repair the defective step would be only nonfeasance. Some cases have applied to such a situation, as the test of the liability of an employee or agent, the classification of his conduct as misfeasance or nonfeasance. This test has been criticized by more recent textwriters as a fictitious distinction, which can only result in confusion. [8 Labatt's Master & Servant, Chap. CXII, p. 7967, sec. 2586; Clarke & Skyles on Law of Agency, p. 1299; 1 Mechem on Agency, sec. 572; 1 Jaggard on Torts, pp. 288, 299.] It is said that this distinction came into our law and was adopted in many states by reason of having been stated in Story's work on the Law of Agency, published in 1839 (see Story, Agency (9 Ed.), sec. 309); and that Judge STORY based it upon a statement made in the dissenting opinion of Chief Justice HOLT in the celebrated case of Lane v. Cotton (decided 1701), 11 Mod. 17, 12 Mod. 472, 88 Eng. Reprint, 855, 1458, Comyns, 107, 92 Eng. Reprint, 984, Holt, 583, 90 Eng. Reprint, 1222, 1 Salk. 17, 1 Ld. Raym, 655, 91 Eng. Reprint, 17, 1337. In the later decisions in a majority of our states this test is either not followed at all or the definition of nonfeasance is so narrowed as to practically eliminate it. [See Smith v. Rutledge, 61 A. L. R. 273; note, 49 A. L. R. 521; note, 20 A. L. R. 97; note, 25 L. R. A. (N. S.) 343, for a discussion of both recent authorities and older cases; see, also, 18 R. C. L., pp. 817 to 821, secs. 270, 274; 39 C. J. 311, sec. 1512.]

Instead of the test of nonfeasance or misfeasance the following has been advocated:

"The true test of the servant's liability to a third person for nonfeasance or negligence is the nonperformance of a duty which he owes to a third person. If a person walking in a street should see an uncovered coal hole in the sidewalk, and he should neglect to cover it, he would undoubtedly not be liable to another person who afterwards fell into it; but if the first person should assume control

of a building with knowledge that there was such an open hole in front of it, and a person should be hurt because it was uncovered, the person having charge of the building, whether as owner or agent or servant, ought to be responsible to third persons, on the theory that a duty to use proper care arises from such control." [7 Labatt's Master & Servant, 7974, sec. 2586.]

The theory of the authorities holding that an employee or agent is not liable to a third person for nonfeasance is that neglect of duty is a violation of his obligation to his master or principal only and that there is no privity between him and a third party, which is assumed to be necessary to allow recovery by such third party for it. This seems to be a further extension of the rule of agency that one acting as an agent in making a contract for his principal is not liable, to the person with whom he contracts, on the principal's contract. It would seem that this view overlooks the fact that privity between the parties is not essential to liability for torts. There are many acts of misfeasance, as well as acts of nonfeasance, of an employee or agent toward his principal which give no right of action to third persons because they are not affected by them, but as pointed out in the annotation in 20 American Law Reports, 97, there are obligations imposed by law and public policy upon all persons living in civilized communities in favor of their neighbors. These arise out of the circumstances of the situation in which the parties are placed. [See Lowery v. Kansas City, supra.] When a servant assumes responsibility over property or instrumentalities and agrees with his master to do certain things in connection therewith, which, if left undone would likely injure third persons, in a place where they have a right to be (as in Labatt's coal hole example), there seems to be no good reason why the servant should not be held liable to third persons injured thereby for his failure to do that which he agreed to do, which he assumed responsibility for, and which was reasonably necessary to be done for their protection. Is it not a better public policy and one which would tend more to prevent accidents caused by neglect to hold that the negligent servant is also liable to the injured person? We think that a situation, such as this one, where an agent of a corporate owner has complete control and management over property, which if not properly maintained might create such a condition as would cause injury to third persons rightfully upon and expected to frequently be, in considerable numbers, upon a stairway which the public was invited to use on so many occasions, presents a case in which such agent not only has a duty to his principal to exercise ordinary care to do what should be done to keep that which was placed in his care in a safe condition, but also one in which he has such a duty to the public as well. This rule is in accord with the American Law Institute's

Restatement of the Law of Agency, chapter 11, sections 354, 455; and Restatement of the Law of Torts, chapter 13, section 387.

That there should be no difference in the agent's liability because his negligent conduct consisted of omissions rather than acts of commission, in such a situation, was recognized by this court in Orcutt v. Century Building Co., 201 Mo. 424, l. c. 447, 99 S. W. 1062, 8 L. R. A. (N. S.) 929. There, a plaintiff was injured by reason of failure to maintain an elevator in good repair. This court, in holding the agent liable, said:

"When it (the defendant) undertook the management of this building from its principal, it undertook to do for the principal a particular work, and after it entered upon the performance of that work, any act which it did, whether by omission or commission, was misfeasance. After making this contract, had it stood aloof and refused to take the management of the building, and in so doing, thereby failed to do something which resulted in injury to a third person, it would not have been liable, because we would thus have mere nonfeasance. But after it assumed its management and thereby commenced to do the thing it contracted and agreed to do, then as said before, acts of omission or commission constitute misfeasance, or *a failure to properly do the things which it had, in the line of its duty, commenced to do.* . . . If the distinction above noted is kept clearly in mind by the court, and nonfeasance held to apply to cases where the agent fails to enter upon the performance of his contractual obligations, and not to cases where he has entered upon such performance but neglected his duties in some respects, this confusion would not arise."

Many other cases hold that an agent or servant in complete control and management of property is liable to third parties injured by his neglect to remedy some unsafe condition thereof. [See Stith v. Newberry Co., 336 Mo. 467, 79 S. W. (2d) 447; Guthrie v. Wenzlick Real Estate Co. (Mo. App.), 54 S. W. (2d) 801; Carson v. Quinn, 127 Mo. App. 525, 105 S. W. 1088; McCarver v. St. Joseph Lead Co., 216 Mo. App. 370, 268 S. W. 687; Lough v. Davis & Co. (Wash.), 70 Pac. 491, 59 L. R. A. 802; Baird v. Shipman (Ill.), 23 N. E. 384, 7 L. R. A. 128; Tippecanoe L. & T. Co. v. Jester (Ind.), 101 N. E. 915, L. R. A. 1915E, 721; Campbell v. Portland Sugar Co. (Me.), 16 Am. Rep. 503; Ellis v. McNaughton (Mich.), 42 N. W. 1113, 15 Am. St. Rep. 308; Belvin v. French (Va.), 3 S. E. 891; Mollino v. Ogden & Clarkson Corp. (N. Y.), 154 N. E. 307, 49 A. L. R. 518; Mayer v. Thompson Hutchison Bldg. Co. (Ala.), 16 So. 620, 28 L. R. A. 433; Carter & Harris v. Atlantic Coast Line Railroad Co. (S. C.), 66 S. E. 997; Ward v. Pullman Car Co. (Ky.), 114 S. W. 754, 25 L. R. A. (N. S.) 343; Pirtle's, Admx., v. Hargis Bank & Trust Co. (Ky.), 44 S. W. (2d) 541; 18 R. C. L. 820, sec.

274.] This court has since followed the rule of the Orcutt case that only the omission of a servant in failing to assume his duties constitutes nonfeasance for which he is not liable, in State ex rel. Hancock v. Falkenhainer, 316 Mo. 651, 1. c. 657, 291 S. W. 466, 1. c. 468, saying:

"Respondents insist that the failure of defendant Carlson to warn plaintiff before starting the machine in motion was an act of omission, and necessarily an act of nonfeasance. We have ruled differently. In the case of Orcutt v. Century Building Co. et al., 201 Mo. 1. c. 446, 99 S. W. 1062, 8 L. R. A. (N. S.) 929, we held in an opinion by GRAVES, J., that when an agent entered upon the performance of the work any act which he did, whether by omission or commission, was misfeasance, and he was jointly liable. The Courts of Appeals are following this case as our last word on the subject. Mc-Carver v. St. Joseph Lead Co., 216 Mo. App. 1. c. 384, 268 S. W. 687; Vaughn v. Creamery & Ice Co. (Mo. App.), 275 S. W. 1. c. 595. A lengthy discussion of the question and a review of the authorities will be found in 20 A. L. R. 97, 1. c. 99 et seq., 137, 139, 155, 165. The Orcutt case in effect, overrules on this question the cases of Steinhauser v. Spraul, 128 Mo. 1. c. 552, 562, 28 S. W. 620, 30 S. W. 102, 27 L. R. A. 441; Bissell v. Roden, 34 Mo. 63, 84 Am. Dec. 71, and Harriman v. Stowe, 57 Mo. 93, cited by respondents. In view of our ruling on this question, we hold defendant Carlson to be jointly liable with defendant Axelson Machine Company."

The St. Louis Court of Appeals, recognizing the rule of this case and the Orcutt case, added the further exception in Varas v. Stewart & Co. (Mo. App.), 17 S. W. (2d) 651, that a mere omission of a servant to do something which was not within his duties as such servant (giving notice defective wiring of truck he was instructed to deliver for repairs on brakes) in performing the work his master commissioned him to perform was nonfeasance which would not make the servant liable. This court took a somewhat similar view of nonfeasance in Eads v. Y. M. C. A., 325 Mo. 577, 29 S. W. (2d) 701. Of course, a servant should not be liable for failing to act outside of the scope of his employment. Limiting the definition of nonfeasance to neglect in failing to assume duties as a servant or agent at all, or to failure to act as to matters entirely outside the duties of such servant or agent, and denominating all acts or omissions in connection with duties within the scope of his employment, misfeasance will eliminate most of the situations out of which conflicting decisions usually have arisen. It would seem, however, that the test, which would be most reasonable, which would really eliminate the confusion resulting from attempting to classify various acts or omissions of agents or employees as misfeasance or nonfeasance, and by which all situations could be more clearly and cor-

rectly solved, would be the rule that a servant or agent is liable for acts or omissions causing injury to third persons whenever, under the circumstances, he owes a duty of care in regard to such matters to such third persons. In short, he would be liable whenever he is guilty of such negligence as would create a liability to another person if no relation of master and servant or principal and agent existed between him and someone else.

So far as the evidence discloses, no officer or agent of the company other than Jones had anything to do with this building except a janitor who cleaned the stairway. Apparently he had nothing to do with repairs, was not in charge of the building, and had no authority to do anything except to report to Jones what he found or what anyone complained about. Jones said that he "had charge of that building" and "was looking after it," and did not limit these statements. He had built the stairs twenty years before the time he again began to look after the building, when his company bought it a few months before plaintiff was injured. He knew how the steps were constructed and should have known better than most persons what inspection to make and what their condition of preservation was. He said that although he looked at the stairway and went out there "two or three times a week," he "never looked at them particularly, . . . as to whether they needed repairs." True, he said that it was "practically impossible" for a step to be loose, but plaintiff had evidence that one was loose and had been loose for three weeks before she fell and that made a question of fact for the jury to settle. We hold that under these circumstances he personally had an obligation to maintain this stairway in a reasonably safe condition for use by the public; that because of this obligation he owed a duty to members of the public using the stairway, the nonperformance which would be negligence; and that, therefore, the court did not err in giving Instruction No. 3 submitting this charge of negligence against him.

■ However, we hold that Jones was not liable for insufficient lighting of the stairway, for the following reason:

First: Jones had assumed no duty as to lights in this stairway either as to the tenants or the public. He had not undertaken to install lights therein or to maintain light bulbs that tenants had installed there or to turn lights on and off.

Second: There was no evidence sufficient to show any condition inherently dangerous in the construction or arrangement of this stairway, and there was no unguarded elevator well or other hole, trap, or dangerous obstruction therein from which a duty to light the stairway might arise whether he assumed it or not. [See McCloskey v. Salveter & Stewart Inv. Co., 317 Mo. 1156, 298 S. W. 226.]

■ Third: There was no statute nor ordinance pleaded or proved which required lights in a stairway in a building of this character.

Fourth: The common-law rule is that "in the absence of statute or agreement, the landlord is under no legal obligation to light common passageways for the benefit of tenants or their visitors." The evidence in this case was that the agreement, if any, was the other way; namely: That the tenants should furnish lights when their invitees used the stairway; that they had installed and maintained their own lights in the stairway and operated them for that purpose; and that the owner had never provided or maintained any lights there. [See 36 C. J. 214, sec. 892; 16 R. C. L. 1041, sec. 560; Underhill on Landlord & Tenant, 810, sec. 492; 1 Tiffany on Landlord & Tenant, 635, sec. 89; 2 McAdam on Landlord & Tenant, 1626; Jones on Landlord & Tenant, 712, sec. 619; 97 A. L. R. 232, note; 75 A. L. R., 166 note; 58 A. L. R. 1419, note; 39 A. L. R. 302, note; 25 A. L. R. 1312, note; Huggett v. Miers (1908), 2 K. B. 278, 1 Br. Rul. Cas., 97, and note 107-110; Watt v. Adams Brothers Harness Mfg. Co., 1 Dom. L. R. (1928) 59.]

Therefore, it was error to give Instruction No. 4, authorizing a verdict against Jones for his failure to furnish lights.

■ In this case, it is sought to hold several alleged joint tortfeasors liable for a single injury, and there must be one final judgment in the same amount against all who are held liable. There is no appeal from the judgment against the Armour Building Company and there is no claim on the part of the appealing defendants that the judgment was excessive as to the amount which plaintiff should recover from such defendants as may be finally determined to be liable therefor, nor of any error in measure of damage instructions. Therefore, under the rule established by this court in Hoelzel v. C., R. I. & P. Railroad Co., 337 Mo. 61, 85 S. W. (2d) 126, and followed by it in Yerger v. Smith, 338 Mo. 140, 89 S. W. (2d) 66, the judgment as to all defendants is reversed and the cause remanded, with directions to the trial court to hold in abeyance the verdict as to both liability and amount of damages against defendant Armour Building Company, until the case is disposed of as to the liability of defendants Jones and Geary, then to enter judgment for the amount of the verdict, held in abeyance, against the Armour Building Company and also against all other defendants, if any, finally found to be liable. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.