173 So. 233

### JONES v. TENNESSEE LAND CO.

### 6 Div. 934.

Supreme Court of Alabama.

Feb. 18, 1937.

Rehearing Denied March 25, 1937.

Harsh, Harsh & Hare and John W. Altman, all of Birmingham, for appellant.

Benners, Burr, McKamy & Forman, of Birmingham, for appellee.

THOMAS, Justice.

The suit was for damages.

The judgment was for the defendant—the trial court giving the general charge for the defendant.

Important questions presented for decision are: The action of the court on the pleadings, rulings on evidence, and the giving of the general affirmative charge for the defendant.

The case was tried on counts 4, 7, and 1-C; counts 4 and 7 claiming damages for negligence causing injury to the invitee of defendant, and count 1-C averring a latent defect known to the defendant at the time of letting and wrongfully concealed from the plaintiff and the tenant, and that the plaintiff was on said premises by invitation of the tenant.

The plaintiff contended that the defendant was liable on four theories:

"(1) Ex contractu—based on an oral contract between the defendant and the tenants of the house to repair the porch, to which contract the plaintiff was privy, and which contract was made for the plaintiff's direct benefit;

"(2) Ex contractu—based on an express oral contract made by the defendant with the plaintiff herself to repair the premises;

"(3) Ex delicto—for negligent injury to the plaintiff on the theory that the plaintiff was the guest of the defendant on the premises, and the defendant negligently maintained the same in a condition not reasonably safe; and

"(4) On the theory of a latent defect."

The effect of the pleading from the viewpoint of the plaintiff was that Mrs. Jones was the initial actor arranging for a house where she would have the right to treat her patient advantageously, and where she would have the right, emanating from the defendant for a valuable consideration, to place and minister to her patient, Mrs. Meckins. The tendency of the testimony of Mrs. Jones as to her conversation with defendant's agent, Mr. Brooks, and that of her other witnesses, supported that theory or phase of the pleading. That is to say, defendant's liability—ex contractu to rent and repair the premises—was established by the contract with the Mannings as tenants, in which plaintiff had a direct interest because it was made with her also, in consideration of procuring the Mannings as tenants, and because defendant agreed with the plain-

tiff and the Mannings to repair the premises and make them safe for occupancy and for invitees thereon.

Evidence as to the latent defect tended to show that the condition of the porch was not disclosed to the Mannings by defendant's agent, Brooks. Mr. Brooks's secretary, Miss Acton, said: "Neither I nor Mr. Brooks, disclosed or stated anything to Mr. Manning about the state of repairs of the house. No person on behalf of the Tennessee Land Company revealed to Mr. Manning anything about the state of repair of that house when that house was let to him."

There was no controversy as to the fact that the plank was worm-eaten and that it broke or collapsed underneath plaintiff's weight. The condition of dry-rot underneath the edges of the porch and near the sills, which was not patent and caused the collapse and injury, was a latent defect not obvious to the parties inspecting the premises for the purpose of renting.

Mr. Brooks testifies as follows, as to the extent of his authority and his statement of the terms of rental:

"Mrs. Jones and Mrs. Manning came to my office on July 19th, 1934, in reference to leasing 4620 Palmer Avenue. Mrs. Jones and Mrs. Manning came to my office and asked to use this 4620 Palmer Avenue to put Mrs. Meckins in until she could be placed elsewhere or could be cured, and I immediately told them we could not permit the building to be used under any arrangement except under the usual terms of lease agreement signed by a company employee. At that time Mrs. Manning asked if she and her husband could rent the building, and I asked her if her husband was an employee of the company and she said he was, and I told her under that condition we would be glad to rent her the house, and for her to have Mr. Manning come to my office and sign the lease. Mrs. Manning stated to me at that time that the plumbing was in bad condition. She stated the sink was down in the kitchen and I think some faucets off. Mrs. Jones mentioned the condition of Mrs. Meckins and I expressed my sympathy with the case and expressed my willingness to help in a personal way any way I could. That is about what was said. Nothing was mentioned about any carpenter repairs whatever. Mrs. Manning said she had inspected the house or gone through it on the way down to my office and told about the plumbing. I sent the plumbers. I made a memorandum on a piece of yellow paper, as is our custom, and placed it on the file for the plumber to get. The plumber did not have anything to do with carpenter work or anything else at all.

"I instructed Miss Acton that Mr. Manning would be in to sign a lease and when he came in if I wasn't there to let him sign the lease. I executed the lease on the evening he signed it. He had signed it when I signed it. The lease was the usual form of lease taken from the employee. I did not have any arrangement with Mrs. Jones as to allowing her to visit the premises. I told Mrs. Jones I could not permit the use of the premises under any arrangement other than the usual lease form, that is, turned over to our employees."

And on cross-examination:

"At the time I agreed these people should take the house, I did not know Mrs. Meckins was an invalid. I knew she was sick. I knew Mrs. Jones was interested in the case. I didn't know she was nursing her. * * * You ask me if it is not a fact that they said they were looking, not so much for a place for the Mannings, but a place to put Mrs. Meckins, and I answer, 'that was the first thing they talked about. The first thing was a proposition to get the house in which to put Mrs. Meckins.' At that time I understood that what they came there for, those people who were then in my office negotiating with me, was that they were looking for a place where Mrs. Meckins could be put and waited on and she was sick. I understood that. Mrs. Manning agreed that she would take the place. There was no agreement of any such kind as that Mrs. Meckins was to stay there. I never had any agreement with Mrs. Meckins at all. You ask me if they told me that Mrs. Manning was going to stay there and Mrs. Meckins was going to stay there, and I state that I presumed that would be the result of it. I presumed that from what was said there. I also presumed or concluded from what was said or done between us that Mrs. Jones was still interested in the case. I couldn't say about her going there to wait on that woman. Before this date, Mrs. Jones and I had both been undertaking to do something for Mrs. Meckins."

And on further examination of this witness the record recites the following:

" 'You never had any experience with your properties running down, or people running off with things?'

"The defendant objected to the question and the court sustained the objection, and the plaintiff then and there duly and legally reserved an exception.

"The witness continued as follows:

" 'I couldn't say how often we would get around to our property, ordinarily, and look at it. Nobody shares my particular duties as real estate agent for the Tennessee Land Company. No one else has the same authority. In a general way, the duties of my employment are, that I have charge of all the Tennessee Land Company's houses in Fairfield. I am responsible for conditions. I will not say it is my duty to look after them with any particular regularity. I would say "no" to the question as to whether or not it was a part of my duty to look after that property. The insurance department would look at it, keep it covered by fire insurance. I looked after covering it with fire insurance. I had seen the house a number of times. I kept acquainted with its approximate condition.'

"Thereupon, the following questions were asked and answers made:

"Q. You kept acquainted with its conditions? A. Its approximate condition.

"Q. Its approximate condition at all times? A. Approximately I did, yes, sir.

"Q. One of the things about the conditions of a house you would look after would be, would it not, whether or not it was beginning to decay or deteriorate or depreciate in any way, wouldn't it; that would be one of the things you would look after? A. That would be one of the things naturally I would be interested in.

"Q. That would be one of the things you would look after? A. Yes sir.

"Q. That would be one of the things you would keep yourself familiar with to a reasonable extent? A. Yes, sir.

"Q. And you would keep acquainted with all these houses, including this house, as to their condition of repair and depreciation and rot, and so forth, to a reasonable extent, not at regular intervals, but from time to time? A. Yes, sir.

"Q. And continually all the period you have been real estate agent for the defendant and up to July 21, 1934, you would keep yourself posted and familiar with the condition of your property out there, including this house? A. As far as possible, I did, yes, sir."

The lease contained provisions to the effect, "that the lessee has examined and knows the condition of said premises and has received the same in good order and repair"; that "the premises * * * are leased solely for residence purposes for occupation by the lessee and the members of the lessee's household and shall not be used for any other purpose"; that "the lessor shall not be liable for any damage occasioned by failure to keep said premises in repair," etc.

■ The general duty imposed by the law on the owner of premises is, to be reasonably sure that he is not inviting another into danger, and to exercise ordinary care and prudence to render and keep his premises in a reasonably safe condition for invitees. Prudential Insurance Co. of America v. Zeidler, pro ami., et al. (Ala. Sup.) 171 So. 634.[1] The duty of a landlord who undertakes to make repairs is stated in the last-cited authority and in Arlington Realty Co. et al. v. Lawson, 228 Ala. 214, 153 So. 425.

■ The liability to third persons for omission to act depends upon whether due care in the performance of the agent's duties makes it necessary for the agent to do the act which is omitted. The omission of the agent to enter upon the performance of his duties, and do such act, is not a negligent performance for which he is liable to third persons; but if he does enter upon the service, negligent performance may result from omitting to do what ought to be done, as well as performing his duties in an improper manner. Prudential Insurance Co. of America v. Zeidler, pro ami., et al., supra; Sloss-Sheffield Steel & Iron Co. et al. v. Wilkes et al., 231 Ala. 511, 165 So. 764.

■ It is a further established rule that real property is leased as it stands, without special covenant by the owner or his authorized agent to make repairs or improvements thereon. Adler v. Miller, 218 Ala. 674, 120 So. 153; Prudential Insurance Co. of America v. Zeidler, pro ami. et al., 233 Ala. 328, 171 So. 634.

---

[1] 233 Ala. 328.

We are brought to a consideration of the giving of the affirmative charge for the defendant on the several counts on which the trial was had. The testimony relating to the oral conversation when Mr. Brooks, Mrs. Manning, and plaintiff were present, shows that Brooks declined to rent the house to Mrs. Meckins or to her agent; that he could only rent to an employee of the defendant; that he would rent to Mr. Manning and requested that Mr. Manning come and sign the lease contract; that Mr. Manning and Brooks did sign the written lease containing terms which we have heretofore indicated.

It is established that a prior conversation leading up to such a contract is merged into the writing. Worthington v. Davis, Director General, 208 Ala. 600, 609, 94 So. 806; Sellers et al. v. Dickert et al., 185 Ala. 206, 214, 64 So. 40; Lambie et al. v. Sloss Iron & Steel Co., 118 Ala. 427, 24 So. 108; Town of Brewton v. Glass, 116 Ala. 629, 22 So. 916.

The lease in evidence reserved no right in the defendant to invite the plaintiff on the premises, the exclusive possession being granted to Charlie Manning. It is thus apparent that defendant, having leased and surrendered the possession to Manning, was without the right to invite the plaintiff on the premises where she was injured. The reserved right to enter and make certain repairs, as to the plumbing, did not include the right to invite a third person on the premises and assume responsibility for personal injury. The contract expressly provided, as we have indicated, that "the lessor shall not be liable for any damage occasioned by failure to keep said premises in repair."

The defendant was, therefore, entitled to the affirmative charge under counts 4 and 7.

To support count 1-C for latent defect, it became the plaintiff's duty to show: (1) That the defect causing the injury was *latent;* (2) that it existed at the time of the letting; (3) that it was known to the defendant at the time of the letting; and (4) that it was not obvious or concealed by defendant's agent from the tenant. The averment of that pleading is that it was "wrongfully concealed * * * from the plaintiff and from the tenant of said premises." If the defect

was patent no recovery could be had in tort: The evidence fails to show that a latent defect was known to Brooks, the defendant's immediate agent, and that he wrongfully concealed such defect from plaintiff; and on this phase of the case, plaintiff has failed in her proof. Mrs. Manning told the agent about the plumbing and he immediately had it repaired, as she requested. The testimony of Brooks, to the effect that he did not know the condition of the porch and that it was in good condition so far as he knew, is unequivocal. There is no evidence to the contrary, nor any sufficient to charge him with notice. That is to say, the positive statement of Brooks that he did not know of the defect in the porch causing the injury—a fact capable of contradiction or adverse inference—did not, under the other evidence, present an issue of fact for the jury. The inference from the testimony sought to be given by the carpenter who examined the premises some months after the accident, when conditions were not shown to be the same, was properly refused.

The tort or negligence of an agent, done or committed in a willful departure from the course of his employment, takes a case from the rule of apparent scope of his authority. Gulf Electric Co. v. Fried, 218 Ala. 684, 119 So. 685; Prudential Insurance Co. of America v. Zeidler, pro ami. et al. (Ala.Sup.) 171 So. 634.[2] Brooks is positive in his testimony that he could only bind his principal by the usual and required lease; that the premises were rented with that knowledge by all parties; that neither plaintiff nor her patient could lease the premises; that he contracted with and did lease the premises to Manning, and placed him and his family in possession; he did not lease to plaintiff or her patient, and did not surrender the possession to either of them.

In the respects indicated, there was no conflict in the evidence or adverse tendencies thereof. McMillan v. Aiken et al., 205 Ala. 35, 40, 88 So. 135. We hold that the affirmative charge was properly given for the defendant under the several counts on which the trial was had.

Affirmed.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.

On Rehearing.

THOMAS, Justice.

■■ If it be conceded that the court improperly struck count 11, upon the theory that it constituted a departure from the suit as originally begun, it would be error without injury to plaintiff; for the all-sufficient reason that the evidence shows, as indicated in the original opinion, that whatever oral agreements or conversations may have been had between the parties, plaintiff and defendant's agent, Brooks, were merged in the written contract thereafter executed between the parties, and this written contract became the sole memorial of their agreement. Therefore, under the evidence the plaintiff would not be entitled to recover for the breach of an oral agreement set up in count 11.

The application for rehearing is therefore overruled.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.