S. H. KRESS & CO. et al. v. SELPH et ux.

No. 4738.

Court of Civil Appeals of Texas. Beaumont.

May 1, 1952.

Rehearing Denied July 9, 1952.

Marcus & Weller, Beaumont, for appellant.

Adams, Browne & Sample, Beaumont, for appellee.

WALKER, Justice.

### Statement

This action is for damages for personal injuries sustained by Mrs. Ida Selph, one of the appellees, when she fell upon the floor of the store operated by S. H. Kress & Company, located in Beaumont, Texas. The plaintiffs are Mr. and Mrs. Selph and the defendants are S. H. Kress & Company and the manager of the store, H. H. Howe.

It is unnecessary to describe the parties' pleadings at this point. The cause was tried to a jury and in response to Special Issues the jury returned the following verdict: (Issue 1) Mrs. Selph slipped and fell in defendants' store on or about June 14, 1947. (Issue 2) Mrs. Selph slipped on a piece of candy in defendants' store. (Issue 3) When Mrs. Selph slipped and fell she sustained an injury to her body. (Issue 4) Said piece of candy "had been on the floor for a sufficient length of time for defendants' agents, servants and employees in the exercise of ordinary care to have discovered and removed same." (Is-

sue 5) The "failure—of defendants, their agents, servants and employees, to remove said piece of candy—prior to Ida Selph's fall—was a proximate cause" of Mrs. Selph's injuries. (Issue 6) Mrs. Selph "did not fail," prior to her fall, to keep a proper lookout as she proceeded out of the store. (Issues 7 and 8) These issues were conditioned upon an affirmative answer to Issue 6 and were unanswered. (Issue 8–A) "It was not the result of an unavoidable accident." (Issue 9) Plaintiffs' damages were assessed at $8,500.

On this verdict the trial court rendered judgment in behalf of the plaintiffs against the two defendants for $8,500 and the defendants have appealed from this judgment.

### Opinion

Points 1, 2, 3, 4, 17, 24, and 25 assign error to the sufficiency of the evidence, either in law or in fact, to support the finding under Issue 4 that the candy which caused Mrs. Selph to fall had been on the floor of Kress' store long enough to have been discovered and removed had the defendants used proper care to make the floor reasonably safe for Kress' customers.

 The jury could have answered this Special Issue favorably to the defendants but they did not, and we have, therefore, to consider only evidence which supports the finding made. This evidence may be summarized as follows:

On Saturday morning, June 14, 1947, at about 11 o'clock, Mrs. Ida Selph entered Kress' store to buy a balloon for her niece, a child about five years old, who accompanied her. The counter where balloons were sold abutted on the aisle which extended along the front of the counter where candy was sold. Mrs. Selph walked along the right hand side of this aisle to the balloon counter and made her purchase. She then walked back along the opposite side of this aisle toward the door, and at a place in front of the candy counter stepped upon a piece of candy with her right foot, and her foot slipped on the candy, and she fell to the floor.

She was assisted to her feet by a person nearby, and reported the incident im-

mediately to the assistant manager of the store. According to Mrs. Selph, this person manifested no interest in what she had to say and after waiting a moment she left the store.

Mrs. Selph described the candy and the place where she fell as follows:

"Well, it was candy. There was quite a bit of it on the floor and it had been mashed and swept over; looked like it had been there for several days. * * *

"Q. How could you tell it had been swept over? A. Well, I have seen things like that on floors before.

"Q. Did it have the marks of a broom over it. A. Yes, sir. * * *

"Q. What color was it? A. Well, it was brown, dirty and looked like chocolate candy. * * * Well, on the floor it looked like chocolate candy mashed on the floor but—the piece I slipped on, where my heel went through, there was some left on the side, and I looked to see what I slipped on, and so I looked on my shoe and pulled some off my shoe, and it was sticky like, a white substance underneath.

"Q. Was that the same substance that had the mark on the floor where you slipped? A. Yes, sir."

On cross-examination she gave some testimony to the same effect and testified also that she saw some other candy there. Thus: "I looked at it to see what I had slipped on; and then I began to see the other spots and pieces that were mashed on the floor." And further: the piece she slipped on "evidently was softer than the appearance of the other. * * * The other looked more packed down than this place where I had slipped.

"Q. Actually you do not know whether that piece of candy had been stepped on before you stepped on it or not, do you? A. Well, yes, you can tell, because it was stuck there on the floor and looked similar to the other pieces that was packed down on the floor.

"Q. That was after you stepped on it wasn't it? A. Yes. Well, I didn't step on the part that was left, because my heel hit and slipped."

888

Subsequently: "Q. And after you got up did you inspect that particular area of the floor? A. I looked down at it and before I got up the first time I saw it was all over the floor and I saw the condition of whatever it was, had been stepped on and swept over."

Further: "Q. These other substances, I believe you say that you saw on the floor, they were of a different character, weren't they? A. Well, I suppose that they were of about the same; they looked like the spot that I had stepped on. I thought it was probably the same thing."

Mrs. Selph was 54 years old at the time of this occurrence. She was then a housewife.

She testified: "Q. * * * in that period of time I suppose you have had lots of occasion to observe objects on the floor and sweep over them yourself? A. I certainly have, for I have worked at different places practically all my life. For the last few years my husband made me quit work." The aisle was paved with terrazzo. The surface was hard and smooth. In color it was light, but had brown spots in it.

The store was large, being 180 feet long by 50 feet wide.

Saturday was the busiest day of the week at this store. Mrs. Selph testified that "there were quite a few people in the store," and further, "there was quite a crowd in the store that morning and all the school children were gathered around the balloon counter." On Saturday, four clerks served the candy counter. Only two clerks worked there on other days. This counter seems to have been between 30 and 40 feet long, and three cash registers were placed on it for the use of the clerks working there. The photographs in evidence show the top of the counter covered with packages and bags of candy, and this was the practice when Mrs. Selph fell.

There was evidence that from time to time candy was found in the aisle before this counter. For instance, the porter testified: "* * * Beginning Monday night through Saturday night that floor is mopped and if there is any candy on the floor we have got a putty knife we carry

in our pocket and scrape every piece of candy off. Very little accumulates there, because that is done all through the day— not just at night; it is done through the day." There was other evidence to the same effect and Watts, who had supervision of this area of the store when Mrs. Selph fell testified: "Q. Do you all sell candy down there, brown candy and black candy, pink candy, white candy, different colors? A. Well, various colors, yes, sir."

There was much evidence concerning Kress' method of keeping the floor clean, and this evidence bears directly on the matter at issue.

The entire personnel of the store were instructed to watch for substances on the floor and to remove what they found or to have it removed. The defendant Howe, manager of the store, seems to have spent most of the day walking about over the store, and he endeavored to comply with these instructions. The assistant manager, Graham, supervised the back part of the store, and Watts, referred to as a "learner", supervised the front part of the store, where the candy counter was, and these two men constantly walked about the areas assigned to them. It was one of their duties to observe the condition of the floor, and Mr. Watts testified that he would pass by the candy counter at intervals "of between 10 or 15 minutes, according to how much business, how many people were in the store." Subordinate employees who supervised the activities of the sales clerks were stationed in the area and also had the same duty. It was also the business of the sales clerks to do this when they could, and the clerk in charge of the candy counter said she was often in the aisle before the counter.

Finally, there was the porter. On Friday night this employee swept and mopped the candy aisle and after he did so his work was inspected by the assistant manager and again the next morning by Mr. Howe, the manager, when he opened the store. According to the evidence the aisle must have been clean when the store opened on the Saturday morning when Mrs. Selph fell. Before 9 o'clock the por-

ter had other duties to perform, but at 9 o'clock in the morning the porter began to patrol the floor of the store with a broom and a dust pan looking for things on the floor. He also carried a putty knife with which he could remove substances which the broom would not remove. He went backward and forward between the front and back of the store, requiring some 30 to 45 minutes to go to the back and then return to the front, and Graham, the assistant manager, said that by the time Mrs. Selph fell the porter would have swept the area about the candy aisle three or four times. This routine was interrupted by the porter's lunch hour, which began at one P.M., and was interrupted once during the morning when the porter emptied the contents of the waste baskets provided for use of the clerks. He said: "* * * When I come down, well, I will probably make a round on the floor, but when the floor is clean then I will get the trash barrel and empty all the trash boxes; probably that will take 30 minutes and I will get my dust pan and start over on the floor."

According to the porter his broom was six inches wide and was three feet long. There was some testimony from Graham, the assistant manager, that the porter had two brooms; one of these was described as being a "hair type" broom and the other as being an ordinary household broom.

There was evidence that the porter had sometimes failed to remove candy from the aisle. Thus the defendant Howe, the manager, testified: "Q. Did you ever in the course of inspecting the floor after it had been mopped, have you ever found any pieces of candy or gum that are allowed to remain there? A. We have found small ones which we made the porter come back and clean up."

The floor of the aisle doubtless tended to conceal candy for, as we have stated, it had brown spots in it.

The defendant Howe, the manager, testified: "Q. If there was anything on the floor in the morning could you approximate how long it could remain on the floor without having been discovered? * * *

A. Well, the porter makes his round on the average of 30 minutes and he would have picked it up. I am certain that in less than 30 minutes one of the supervisors working in that area would have seen it and had it removed."

Points 1, 2, 3, 4, 17, 24, and 25 are overruled.

■ The storekeeper's duty to his patron has been described as follows: "A storekeeper must exercise some care to see that his store is kept in a reasonably safe condition for his customers, even though he has no actual knowledge of any fact that would lead him to believe that a dangerous situation existed." R. E. Cox Dry Goods Co. v. Kellog, Tex.Civ.App., 145 S.W.2d 675, at page 677.

The measure of the time allowed the storekeeper to discover and remove substances on the floor of his store which are dangerous to his patrons is indicated by the following quotations. Thus, in R. E. Cox Dry Goods Co. v. Kellog, the court said, 145 S.W.2d at page 678: "* * * the jury was justified in concluding as it did that in view of the size of the store, the amount of trade carried on therein, and the frequency with which the aisle was used, together with all of the other circumstances in evidence, Cox did not exercise ordinary care to discover and remove the dangerous situation prior to Mrs. Kellog's injury." In Langley v. F. W. Woolworth Co., 47 R.I. 165, 131 A. 194, at page 196, the Supreme Court of Rhode Island stated: "We do not think that time alone (the reference is to time actually elapsed) can be made the test of constructive notice to a storekeeper of the dangerous condition of his floor. What may be a reasonable time within which to say he should have known of and removed the danger will vary with the nature of the business, the size of the store, the number of customers, the nature of the dangerous substance, its location, frequency of travel over it, the probability of stepping upon it, the opportunity to see and remove it, the location of the danger with reference to aisles and counters, the light in the store, how the substance came to be upon the floor, and other circumstances."

■ Whether a dangerous substance has been upon the floor of the store long enough for it to have been discovered and removed before the plaintiff is injured had the storekeeper been exercising due care toward his patrons is a question of fact which may be proved by circumstances as are other facts, and the appearance and condition of the substance causing the plaintiff to fall and of the surrounding area of the floor may be significant circumstances. Thus, it is said by the annotator at 162 A.L.R. 955: "The nature of a defect or its condition may be such as to give rise to an inference that it has existed for a time sufficient to give constructive notice thereof to the proprietor of the premises." And see Crystal Palace, Inc. v. Nelson, Tex.Civ.App., 300 S.W. 183, and the comments on motion for rehearing in Safeway Stores, Inc. v. Miller, Tex.Civ. App., 110 S.W.2d 927. This rule has been applied in the following cases where the patron was caused to fall by a substance on the place where he had stepped: H. E. Butt Grocery Co. v. Johnson, Tex.Civ.App., 226 S.W.2d 501; Langley v. F. W. Woolworth Co., 47 R.I. 165, 131 A. 194; Scott v. Kline's, Mo.App., 284 S.W. 831; S. S. Kresge Co. v. Rankin, 4 Cir., 149 F.2d 934; Anjou v. Boston Elevated Ry. Co., 208 Mass. 273, 94 N.E. 386; Hudson v. F. W. Woolworth Co., 275 Mass. 469, 176 N.E. 188; Fournier v. New York, N. H. & H. R. R. Co., 286 Mass. 7, 189 N.E. 574, 92 A.L.R. 610; Foley v. F. W. Woolworth Co., 293 Mass. 232, 199 N.E. 739; Zanes v. Malden & Melrose Gas Light Co., 298 Mass. 569, 11 N.E.2d 498; Connair v. J. H. Beattie Co., 298 Mass. 550, 11 N.E.2d 499; Bavosi v. Interstate Theatres Corp., 307 Mass. 124, 29 N.E.2d 688; Berube v. Economy Gro. Stores, 315 Mass. 89, 51 N. E.2d 777. In the following cases, it was held that circumstances showed that the storekeeper put the substance on the floor: Campbell v. F. W. Woolworth Co., Tex. Civ.App., 16 S.W.2d 907, analyzed and reaffirmed by the same court in F. W. Woolworth Co. v. Goldston, Tex.Civ.App., 155 S.W.2d 830; S. H. Kress & Co. v. Hall, Tex.Civ.App., 154 S.W.2d 278.

The circumstances listed in our statement of proof support the finding under Issue 4. The candy on which Mrs. Selph stepped created a condition dangerous to the patrons of Kress' store and the defendants knew that candy might be found in this aisle at any time during the day. The candy was in a busy aisle, before a counter patronized by many people, and was open and apparent to view, and there were a number of people in the immediate vicinity whose constant duty it was to find and remove this candy and who had frequent opportunities to do so. The appearance of the candy showed that it had been trod upon by others, and that the porter had actually passed over it with his broom. We think that Mrs. Selph's testimony about the broom marks on the candy was competent proof. The mark of the broom is characteristic and Mrs. Selph was a housewife. The porter actually had a broom which he used throughout the day and the jury could have inferred from the testimony of witnesses other than Mrs. Selph that the porter actually passed along this aisle with his broom, performing his duty to clean the aisle, not long before Mrs. Selph fell. The porter had sometimes failed to remove candy in the past and thus he might well have failed to do so this time. The circumstances are as strong as those often held to support a finding of negligence on the storekeeper's part, as the decisions listed above show.

■ The jury were authorized to infer that Mrs. Selph's description of the candy she saw on the floor was intended to apply to all of the candy she saw at the place where she fell. Mrs. Selph did not see the candy before she stepped upon it, but this was only a circumstance indicating how long the candy had been on the floor. It does not conclusively show that the candy was placed on the floor after Mrs. Selph entered the store. The jury were authorized to conclude that a patron exercising due care for his own safety might well have failed to see the candy before he stepped upon it. Inconsistencies in Mrs. Selph's testimony raised only issues of fact for the jury. There was no incon-

sistency between Mrs. Selph's statement that she actually stepped upon one piece of candy and her other statements that she saw other candy at the same place.

Point 5 reads: "There being no evidence that H. H. Howe, the manager of the Kress & Company store, was guilty of any act of misfeasance for which he would be personally responsible, the defendant, H. H. Howe, could not be held personally responsible for the alleged failure of defendant, Kress & Company, its agents, servants or employees, in failing to discover the alleged piece of candy in the exercise of ordinary care; therefore, the complaint did not state a cause of action against H. H. Howe, and it was an error to submit any issue to the jury and to render judgment against said defendant."

Howe was an employee of Kress, and in that capacity was the manager of the store when Mrs. Selph fell in the store· He had occupied this place for more than a year before Mrs. Selph fell and he had held it since.

Howe was charged with the operation of the store for Kress, and was the superior officer of all other employees of Kress' who worked in this store. He hired the porter. He testified: "Q. As I understand, you have as general manager authority to direct any part of the conduct of the business of the store? A. That's right."

One of Howe's duties was to maintain the floor of the store in condition safe for the use of Kress' patrons, and he performed this in person and also through the other employees working in the store, all of whom had been instructed to watch for things on the floor. Howe had been instructed by his own superior officers to keep the floor clean of dangerous substances; he had repeated these instructions to all other people working in this store; he continually engaged, day by day, in observing the condition of the floor; he inspected the candy aisle at night after the porter had mopped it, although the primary duty of making this inspection was the Assistant Manager's and this employee diligently performed it; and Howe inspected that aisle again in the morning when he opened the doors of the building.

Howe was intermediate in rank among the employees of Kress'. The officer next above him was stationed at Kansas City. This officer had authority to tell Howe what to do in the performance of Howe's duties, but Howe acted on his own responsibility when a superior was not undertaking to direct him. Doubtless Howe executed policies and recommendations relayed to him by this officer. Howe described his relationship to this official as follows:

"Q. But as far as Kress & Company is concerned, Mr. Howe, you are the man in control of those premises leased by Kress & Company, isn't that correct? You wouldn't tell me somebody else is in charge of those premises, would you, acting for Kress & Company? A. Well, we have a District Manager, who I am responsible to, and who comes to the store periodically and checks.

"Q. Would you say he is in charge of the premises? A. Well, I take orders from him. If he wants changes made, I make them. So far as the man being in charge of the building that we occupy throughout the day, I am responsible for it then. When he comes here, the orders he issues supersede mine and I do what he wants done.

"Q. Somebody has to be in charge of it? A. I am in charge of the store.

"Q. Kress has somebody in charge of it and I want to know who it is. A. I am in charge of the building occupied by Kress and Company."

There is no proof that Howe either knew that the candy was on the floor or that he had had any part in causing it to be there. The general competency of Howe's subordinates is not in issue.

Our discussion of Points 1, 2, 3, 4, 17, 24, and 25 shows what measures had been adopted to keep the floor of the store clean of dangerous substances.

Point 5 is sustained on the following grounds:

892

A servant's liability in tort to a third person does not invariably depend upon a distinction between misfeasance and nonfeasance, if by nonfeasance is meant simply a servant's omission to do something which he had undertaken, in general, to do, in behalf of the master. Quoting from Harper on Torts, No. 299, p. 636 et seq.: "Some confusion has arisen in the cases respecting the servant's liability for negligence, the older view, supported by Story and founded upon a dictum of Lord Holt, holding the servant for malfeasance or misfeasance, but not for a mere nonfeasance. This notion rested apparently upon the view that the servant was obligated to affirmatively perform acts only to his master. The fallacy, of course, consists in assuming that the extent of the servant's affirmative duties is determined solely by his contract of service. By the sound view, his duties of care depend upon his relationship with the person threatened or harmed, and whenever he is brought into relation with third persons, whether as a result of his function as somebody's servant or not, so that he comes within the ordinary principles of negligence, his duties to such third persons are determined by the law of negligence and a breach thereof makes him liable. Whether a servant is liable for a nonfeasance will depend, therefore, on whether he has violated an affirmative obligation to the plaintiff imposed upon him by the law of negligence. The fact that he is a servant will have nothing to do with the question."

Statements in Labadie v. Hawley, 61 Tex. 177, indicate that an agent is not liable to a third party for an omission; but in that case the agent did not have control of the premises when the nuisance was created or while it existed; he did not participate in the creation or operation of the nuisance; and the facts recited in the opinion do not show that when he authorized the erection of the stove, he either knew or should have known that it would be a nuisance. Thus, if the agent did owe a duty to his master there is nothing to show that he owed one to the plaintiff. Statements distinguishing between liability for a servant's misfeasance and nonfeasance have been repeated in other decisions. See: Eastin & Knox v. Texas & P. Ry. Co., 99 Tex. 654, 92 S.W. 838; 2nd appeal sub nomine Texas & P. Ry. Co. v. Eastin & Knox, 100 Tex. 556, 102 S.W. 105; Montgomery v. Allis-Chalmers Mfg. Co., Tex.Civ.App., 164 S.W.2d 556; Seismic Explorations v. Dobray, Tex.Civ.App., 169 S.W.2d 739; Conrick v. Houston Civic Opera Ass'n, Tex.Civ.App., 99 S.W.2d 382; Dollar v. Lockney Supply Co., Tex.Civ.App., 164 S.W. 1076. But in the action of Eastin & Knox, the court does not define nonfeasance, and since the servant committed a misfeasance, the court's statements regarding nonfeasance were really dicta. In Montgomery's action, the facts recited in the opinion do not show that the "branch manager" owed the plaintiff a duty to correct the dangerous situation. He may or may not have been the custodian of the premises. Dollar v. Lockney Supply Co. and Conrick v. Opera Ass'n are not in point. And in Seismic Explorations v. Dobray, the Court of Civil Appeals seems to have determined Reynolds' liability by the nature of the duty he owed to the plaintiff.

However, any authority which statements in these opinions might otherwise have has been affected by the decision in Fox v. Dallas Hotel Co., 111 Tex. 461 at page 473 et seq., 240 S.W. 517. There the Hotel Company, which owned the building, had made a contract with a tenant to maintain the tenant's elevators, and the tenant's watchman was injured while rightfully attempting to operate one of these elevators. This machine the defendant had failed to keep in repair, and the court determined liability for this by inquiring whether the defendant owed the watchman a duty, not by a distinction between misfeasance and nonfeasance. But this distinction was before the court and we construe the decision as holding that an agent is liable to a third person if, under the law of negligence, he is charged with a duty toward that person, even though his conduct be omission rather than commission, nonfeasance rather than mis-

feasance. There is much authority for this holding. See: 20 A.L.R. 97; 99 A.L.A. 408, and supplemental decisions; Ward v. Pullman Co., 131 Ky. 142, 114 S.W. 754, 25 L. R.A., N.S., 343; 3 C.J.S., Agency, § 221-a, p. 130, § 223, p. 134.

Thus we have to decide whether Howe owed Mrs. Selph a duty to remove the candy which caused her fall, and if he did, the nature and scope of this duty and whether he violated it. The existence or not of the duty depends, in the first instance, upon whether Howe had the required control of the premises. Thus in Fox v. Dallas Hotel Co., the court said of the defendant: "Having brought under its control a mechanical appliance, which was, or should have been, known to be attended by grave risks, defendant in error was under the specific, legal duty to exercise ordinary care to protect those for whose use the appliance was provided against the risks it foresaw or should have foreseen." 111 Tex. at page 473, 240 S.W. at page 520. Section 355 of the Restatement of Agency reads: "An agent who has the custody of land or chattels and who should realize that there is an undue risk that their condition will cause harm to the person, land, or chattels of other is subject to liability for such harm caused, during the continuance of his custody, by his failure to use care to take such reasonable precautions as he is authorized to take." Comment (a) thereunder reads in part: "One who is in complete control over either land or chattels is under the same duty to protect others from the condition of such things as is the possessor of land or chattels. * * * The custodian in complete charge is not excused from liability by the fact that he is acting for the benefit of another. He is subject to the same liability and has the same immunities as the possessor." Comment (b) reads in part: "If an agent has only a limited control over land or chattels he is subject to liability only to the extent that he is authorized to exercise such control." Section 387 of the Restatement of Torts reads: "An independent contractor or servant to whom the owner or possessor of land turns over the entire charge thereof is subject to the same liability for harm caused to others within or outside the land by his failure to exercise reasonable care to maintain the land in safe repair as though he were the possessor of the land." Comment (a) reads in part: "In order to create liability under the rule stated * * it is not necessary that the contractor be given the possession or occupation of the land or building. On the other hand, the contractor must have taken over the entire charge of the land or building."

These citations also show what degree of control of the premises the servant must have to be charged with a duty to maintain them. This servant must be the custodian, in complete charge and control of the premises, given the duty by the master to see that the particular defect does not exist and vested by the master with authority to correct this defect. However, the existence of a superior authority in another servant is consistent with such control and must, indeed, be implied if any servant of a corporation except the board of directors is to be held liable.

We hold that the testimony of Mr. Howe shows as a matter of law that he was the custodian and had this sort of control of the store, as regards the particular defect which caused Mrs. Selph's injury. The conclusion to which this leads is that Howe owed Mrs. Selph a duty to have the floor of the store in safe condition. This duty, of course, was only one to use due care; Howe's liability is in negligence.

The next question arising concerns the nature and scope of Howe's duty to use care. Was Howe's duty personal only or was it non-delegable? That is, was Howe vicariously liable for the negligent failure of a subordinate to remove the candy before Mrs. Selph fell? If the duty was personal Howe was not liable to plaintiff because he did not cause the candy to be on the floor and he did not know that the candy was there. The general competency of his subordinates is really not in issue, as we have said; but there is nothing in proof to show that any of them were incompetent and they seem to have been suitable persons. However, our discussion of defend-

ants' Points 1, 2, 3, 4, 17, 24, and 25 show that the jury could have found the porter and perhaps other subordinates to be negligent in failing to remove the candy before Mrs. Selph fell, and if Howe's duty was non-delegable he is liable for this negligence of his subordinates.

In such Texas cases as we have seen which hold the servant liable this question was not involved. Thus, in Fox v. Dallas Hotel Co. the defendant acted through servants of its own and seems, indeed, to have been an independent contractor. And in Kenney v. Lane, 9 Tex.Civ.App. 150, 36 S.W. 1063, the servant knew of the defect in time to have corrected it before the workman was injured and, being in control of the work, could have done this.

■ Generally a servant of Mr. Howe's rank is not liable for the negligence of a competent subordinate in which he did not participate, because the subordinate is the servant of the master and not of his superior officer. See: Ladonia Dry Goods Co. v. Conyers, Tex.Civ.App., 58 S.W. 967; Restatement of Agency, Sec. 358; 2 C.J.S., Agency, § 137–b, p. 1362; 3 C.J.S., Agency, § 222, p. 133; 61 A.L.R. 277. And see, in connection with this rule and with others to be mentioned: 49 A.L.R. 521 and 138 A.L.R. 1093, and supplemental decisions. In Malloy v. Fong, 37 Cal.2d 356, 232 P.2d 241, at page 254, the Supreme Court of California said: "The doctrine of respondeat superior is not applicable to the relationship between a supervisor and his subordinate employees. The supervisor occupies an economic and legal position quite different from that of the employer. It is not the supervisor's work that is being performed, nor does he share in the profits which the employees' conduct is designed to produce. In the usual situation, furthermore, he like his subordinates, is a wage-earner, and he is seldom able to respond in damages to an appreciably greater extent than they. For these reasons, the law has shifted financial responsibility from the supervisor, who exercises immediate control, to the employer, who exercises ultimate control and for whose benefit the work is done." Whether historically correct or not this reasoning is cogent.

This general rule has been applied in behalf of the servant in custody of land, whose duty to the invitee has been regarded as personal, not as non-delegable. See: Bailey v. Zlotnik, 77 U.S.App.D.C. 84, 133 F.2d 35.

However, it seems to have been held by the Supreme Court of Missouri that the duty of the servant is non-delegable, and that the servant is liable for the negligent omission of his subordinate. Thus, in Stith v. J. J. Newberry Co., 336 Mo. 467, 79 S.W.2d 447, 455, the manager of the store was held liable to a person on the sidewalk who slipped upon an accumulation of ice on the walk, fell and was injured. This ice had formed from snow and water which had accumulated on the awning of the store, had melted and dripped upon the walk, and had frozen there. The Supreme Court of Missouri, in discussing the liability of Johnson, the manager, said: "Our first opinion holds, and we think properly so, on the authority of Orcutt v. Century Bldg. Co., 201 Mo. 424, 99 S.W. 1062, 8 L.R.A.,N.S., 929; * * * and many other cases, that, as it was the duty of defendant Johnson as manager of this store, both to his employer and to the public, to see to it that the awning over the sidewalk was kept and operated in a reasonably safe condition, he could not escape liability here on the ground that his negligence is one of nonfeasance instead of misfeasance. His position as manager of the store and business placed upon him the responsibility of properly handling and maintaining the awning. He had authority over the other employees, and should have kept the awning in a position and condition not likely to cause harm to pedestrians on the sidewalk either by his own efforts or through employees who were there to act under his orders. His duty in that respect was the same as that of his employer. 'The person having charge of the building,' whether as owner or agent or servant, ought to be responsible to third persons, on the theory that a duty to use proper care arises from such control.' 7 Labatt's Master and Servant, (2nd Ed.) p. 7974, #2586." In addition to the case of Orcutt v. Century Bldg. Co., see the following Missouri decisions:

Lambert v. Jones, 339 Mo. 677, 98 S.W.2d 752; Brown v. Yeckel, Earickson & Co., Mo.App., 129 S.W.2d 66. And see: concerning the Missouri rule: Franklin v. May Dept. Stores Co., D.C., 25 F.Supp. 735; Landreth v. Phillips Petroleum Co., D.C., 74 F.Supp. 801.

On the other hand, the Supreme Court of Alabama has held in Waters v. Anthony, 252 Ala. 244, 40 So.2d 316, 319, that the liability of a theater manager for an injury to a patron from a defective seat was for the jury where the manager had adopted a particular method of performing his duty to keep the theater seats safe for patrons. The court said: "The evidence shows that Lackey was the active manager of the theater, and had charge of the physical condition of it, including seats and lights, and was engaged in the performance of his duties on that day. In doing so, he owed a patron of the theater a duty to exercise due care to have the seat used by her reasonably free from danger, and if he was negligent in this respect proximately causing injury to her, he and his employer were jointly liable." This, of course, is like the duty with which we have charged Mr. Howe. The court said further: "It was shown by his (Lackey's) evidence to be his custom to inspect the seats every Tuesday afternoon and to a certain extent every day. The theater was cleaned by a maid every day, and it was her duty if she found anything wrong with a seat to turn it down. And Lackey's custom was to go down the aisles every day and see if the maid had turned down any seats. But as manager of the theater in charge of the physical condition of the seats, it cannot be said that those were the only duties owing by him as to their safe condition. His custom in that regard was apparently his own plan, and prescribed by himself as manager in charge of the condition of the seats. He can not set up for himself a custom as the standard by which his duty is measured, and then contend that a diligent discharge of it was all he owed to the public. His recital of the custom of inspection used by him was evidently meant to rebut the evidence that the seat was defective, as the plaintiff contended. It was for the jury to say whether he discharged his duty in the matter of the physical conditions of the seats." In connection with the decision cited see: Sloss-Sheffield Steel & Iron Co. v. Wilkes, 231 Ala. 511, 165 So. 764, 109 A.L.R. 385; Prudential Ins. Co. v. Zeidler, 233 Ala. 328, 171 So. 634; Jones v. Tennessee Land Co., 234 Ala. 25, 173 So. 233, all by the Supreme Court of Alabama.

We construe this decision as holding that the manager of the theater discharged his duty of due care to the patron by having a proper and efficient method for the performance of his duty. (The competency of the subordinate was not involved, and the manager did nothing to cause the defect.) If the jury found him negligent, he would be liable for the maid's failure to notice the defect, but otherwise he would not. This holding seems intermediate between Bailey v. Zlotnick and Stith v. Newbury Co.

We adopt the Alabama court's rule of decision and hold that Howe's duty concerning the particular defect was not nondelegable in the sense that his master's was, and that the due care for Mrs. Selph's safety was required of him was exercised if he adopted proper measures to have the floor in safe condition. It seems unjust to extend Howe's liability further. He could not perform the duty in person; he was compelled by circumstances to delegate it to others; and it seems obvious that his employer expected and intended him to do so. The store was his master's, not his; and to hold him absolutely liable for a subordinate's negligent failure to remove the candy would subject him to his master's loss without his master's recompense. This store was large and the liability would be heavy. It may be that in other circumstances the intermediate servant's duty, because of the importance of its performance or for other reasons should be held nondelegable in the full sense of that word, (see the concluding sentence of comment (a), Sec. 355, Restatement of Agency) but we are not convinced that it should be here. The question is, which rule would best serve the public interest. The answer to be made is a controversial one,

but it seems to us that the public interest does not require an extension of Howe's duty and liability beyond that made here.

The ground of liability suggested by our conclusion was not submitted to the jury and it was therefore waived; but it seems to us that Howe had adopted proper methods for keeping the floor of the store clean. The system did not protect Mrs. Selph in this case, but Howe was not an insurer; his duty to Mrs. Selph was only to exercise due care.

In their counter-points 1, 2, 3, 4, and 8 the plaintiffs have assigned error to the order of the trial court striking, on defendants' exceptions, the following allegations of the petition: "And in connection with the foregoing plaintiffs would further show the Court that defendant Howe was the manager of said store and as such was in the sole and exclusive control of same for and in behalf of the defendant S. H. Kress and Company, and said defendant H. H. Howe determined the pay of employees in said store and assigned said employees to the various duties performed by them in said store, and, as manager of said store supervised the display of merchandise in said store, and passed by said candy counter frequently, and ordered the merchandise which was to be sold in said store, and determined what was to be purchased and sold, and controlled all of that portion of the premises leased by defendant Kress and Company, and defendant Howe's income from said business was determined upon a percentage of the sales made in said business and wholly depended upon the amount of sales in said business and the employees of said store were and are paid out of the proceeds of business done in said store, and that defendant H. H. Howe devoted all of his time in labor to said business and was not in any other business."

None of these allegations affect our conclusion about Howe's liability because even under these allegations Howe remains a servant; he is not a partner of Kress nor is he a member of a joint enterprise. No workable distinction between servants could be based on the way their pay was determined by the master.

Point 6 assigns as error that the verdict against the defendants Kress and Howe was joint, and that if Howe be discharged, then so must Kress be, under a common law rule that a joint verdict if set aside in part is wholly set aside. The common law rule referred to is discussed in Burton v. Roberson, 139 Tex. 562, 164 S.W.2d 524, 143 A.L.R. 1. The question before us is what judgment to render under Texas Rules of Civil Procedure, rule 434, and this Court may affirm a trial court's judgment against one defendant charged as a joint tortfeasor and reverse that judgment as to another defendant so charged. The liability of defendants charged as joint tortfeasors, as Kress and Howe were, is several as well as joint; and the record does not indicate that Howe's presence was harmful to Kress as co-defendant. Point 6 is overruled on the authority of Missouri K. & T. Ry. Co. v. Enos, 92 Tex. 577, 50 S.W. 928; Burton v. Roberson, supra; Waters v. Anthony, 256 Ala. 370, 54 So. 2d 589; 57 C.J.S., Master and Servant, § 619, p. 423, "Extent and limits of rule".

Points 7, 8, and 9 assign error to the action of the United States District Court in remanding this cause to the trial court, and to the action of the trial court in trying the cause.

There were two of these removal proceedings. The first was filed in the trial court, which granted a removal, and the second was filed in the United States District Court, and in each proceeding the United States Court remanded the cause to the trial court.

The orders of remand by the United States Court are final and the trial court did not err in trying the case on the merits. U.S.C.A., Title 28, § 1447(d); Bourget v. New England Tel. & Tel. Co., 97 N.H. 193, 84 A.2d 830; Western Union Tel. Co. v. Luck, 91 Tex. 178, at page 181, 41 S.W. 469; Mo.-Pac. R. R. Co. v. Fitzgerald, 160 U.S. 556, 16 S.Ct. 389, 40 L. Ed. 536; Metropolitan Casualty Ins. Co. v. Stevens, 312 U.S. 563, 61 S.Ct. 715, 85 L.Ed. 1044.

Point 10 assigns error to the trial court's order overruling defendants'

motion for a mistrial, which alleged that the juror Stephenson had entered the store during the trial and had viewed the aisle where Mrs. Selph fell. Stephenson said that he had entered the store about 4 o'clock in the afternoon to get a drink of water at a fountain there; that he had bought a package of candy at the candy counter; and that he had traversed the aisle on his way out of the store. He testified further:

"Q. Did you take a look at the floor while you were there? A. Well, not necessarily, no. * * *

"Q. You came out down that aisle, went to the candy counter, and bought some candy and went on out? A. Yes, sir.

"Q. Did you pay particular attention to the floors? A. I can't say I did.

"Q. Can you say you didn't? A. Well, I will say I was looking where I was walking. I certainly wouldn't have walked over a basket or anything in front of me."

The defendants put in evidence three excellent photographs of the aisle, showing the floor of the aisle, the candy counter and adjacent counters. That marked D-1 was taken at a point in the aisle which was a considerable distance from the door opening upon the street, and it shows the entire length of the aisle extending along the candy counter and other counters adjacent thereto, which lay farther from the street than the candy counter did. This picture shows the aisle extending to the door, shows the nature of the surface of the floor and the relative width of the aisle, shows the candy counter with packages of candy stacked upon it over its entire length, and shows the other counters in the store with the goods sold at these counters. The picture marked D-2 was taken at a point in the aisle facing toward the door but nearer the door, and it shows the entire length of the candy counter and also the aisle and the ends of counters across the aisle from the candy counter. This picture shows more clearly and in more detail matters shown in the picture D-1. The picture marked D-3 seems to have been taken from a point just inside the door. This picture shows the aisle running from the door toward the interior of the store and it shows the candy counters with stacks of bags of candy on it and most clearly of all the matters shown in the other two pictures. There was other evidence that the floor was of terrazzo, that it was hard and smooth and that it was of a light color with brown spots. There was also some evidence tending to show the approximate length of the candy counter aisle. Under the circumstances, the jury actually had before them so much of the information which Mr. Stephenson could have acquired while he was in the store that his conduct could not have caused the defendants any harm. It does not appear that Stephenson talked to other jurors about his trip to the store and Point 10 is overruled on the ground that it presents harmless error.

Under Points 11 to 14 error is assigned to statements by plaintiffs' counsel and by the trial court to the jurors Mouton and Stephenson, made while these two jurors were being questioned concerning their supposed entry of the store during the trial. Stephenson had gone into the store but Mouton had not. On Mouton's examination the following occurred:

"By Mr. Adams: Q. You understood that Kress and Company has filed a motion for mis-trial on the ground of your misconduct? * * *

"Mr. Weller: If the Court please, I object to counsel stating that. In other words —I haven't said that Mr. Mouton did any misconduct. I merely asked him, based on information that was furnished me. I wouldn't want to do anything to embarrass Mr. Mouton, and I will ask the Court now to instruct Mr. Mouton that this matter is not to be discussed or considered in any way in his deliberations on this case.

"The Court: The Court will so instruct you, Mr. Mouton. All legal matters come the Court; the legal points involved come to the Court, and the Court submits the issues of fact to the jury. If you tell me you didn't go down there, I believe you. You can go back to the jury box. (Juror Mouton leaves room and Juror W. C. Stephenson enters.)

"Mr. Adams: Your Honor, I think Mr. Weller ought in fairness to this gentleman, (reference is to Stephenson) to state to this gentleman what this hearing is about.

"The Court: There is a motion before the Court for mistrial, alleging that these parties went into the premises yesterday afternoon."

Later: "The Court: Mr. Stephenson, I am going to ask you not to discuss what was talked about to you in the presence of the rest of the jury or anyone else. Of course, as an attorney, he has a right to try to represent his client, and if they can show any misconduct, it is their privilege and their duty.

"Mr. Weller: If the Court please, I object to the Court's statement to the witness, and ask that the Court tell the witness we are merely trying to ascertain the facts regarding it.

"The Court: That's what I said; you are merely trying to do what you think is right.

"Mr. Weller: I ask the Court to instruct him not to discuss anything he may have seen.

"The Court: I do charge you again, not to consider anything in your deliberations except what has come to you from the witness stand, either in the form of oral testimony, or instruments introduced, and the Court's charge, which will be given you in writing."

Points 11 to 14, inclusive, are overruled. The trial court had the discretion to decide how these jurors would be examined, and it cannot have been error as a matter of law that the jurors were told the nature of the allegations made against them, at least of the statements to them were correct and were expressed in language which the jurors might be expected to understand. Considered as a whole, the matter seems adequately put to Jurors Mouton and Stephenson. Under the circumstances of this particular case the trial court did not owe the defendants any duty to conceal from the jurors the matter which was under investigation. The statements to Mouton and Stephenson did not deprive the defendants of any opportunity to properly and completely present the misconduct alleged by them or to fully investigate the facts.

The contention made under Points 15 and 16 is not entirely clear to us but as we construe defendants' argument the defendants are complaining of the trial court's refusal to limit the plaintiffs' proof about candy on the floor to the piece of candy on which Mrs. Selph slipped, and this argument is based on admissions made before trial which defendants construe as being statements that Mrs. Selph slipped on one piece of candy. Mrs. Selph at least so testified on trial, and we note that the charge to the jury was framed on the theory that she had slipped on *a* piece of candy. See Issues 2, 4, and 5 of the trial court's charge. Under these circumstances the jury could not have believed that Mrs. Selph slipped on anything else. However, proof that other candy was on the floor was not inconsistent with this testimony of Mrs. Selph's, and such proof was a relevant circumstance to be considered by the jury in determining whether the candy which caused Mrs. Selph to fall should have been discovered and removed before Mrs. Selph did fall. These points are overruled.

Points 18 and 19 repeat certain objections to the form of Special Issues 1 and 2 of the trial court's charge, which the trial court overruled. Issue 1 inquired whether Mrs. Selph fell "on or about June 14, 1947." Defendants say that proof was made on an event which occurred on June 14 at about 11 o'clock A.M., and that Issue 1 should have referred to this time and date, and because it did not, permitted the jury to speculate. Issue 2 mentions no date, but it was conditioned upon an affirmative answer to Issue 1, and defendants say that it assumed what was expressly stated in Issue 1. These points are overruled. There was only proof of one fall by Mrs. Selph and the jury could not have been misled. Furthermore, the issues were in accord with the proof actually made. Thus Mrs. Selph testified: "Q. Mrs. Selph did you have occasion to be in S. H. Kress & Company's store *on or about* June 14, of 1947? A. Yes, sir. I went in there to make a purchase." Defend-

ants' request No. 4 for admission by plaintiffs was: "On June 14, 1947 Mrs. Selph entered the Kress Store in Beaumont at the extreme north door on the Pearl Street side and walked down the extreme north aisle to the balloon counter." Plaintiffs replied: "Plaintiffs admit the truth of the statements set forth in paragraph 4 in said request, except plaintiffs say the date June 14, 1947 is correct to the best of their recollection."

Points 20 to 31, inclusive, repeat certain objections to Issue 4 and Point 39 brings forward an instruction which defendants asked be given with Issue 4.

Issue 4 and the jury's answer thereto were: "Do you find from a preponderance of the evidence that said piece of candy—at the time plaintiff's wife, Ida Selph, slipped and fell—had been on the floor for a sufficient length of time for defendants' agents, servants and employees in the exercise of ordinary care to have discovered and removed same? A. Yes."

■ These points are overruled, with the following comments:

(a) Under Point 20 defendants say that Issue 4 does not limit the jury to one piece of candy on which Mrs. Selph said that she had slipped.

The issue should not have been so limited. Mrs. Selph thought that she did slip on one piece of candy, but the jury could have found that this was with other candy, and that all of this candy had been on the floor long enough to have been discovered and removed had due care been used.

(b) Point 21 quotes the following objection: "(11c) Said issue as submitted does not give the jury any standard of care required of the defendants, or either of them, and permits the jury to set up its own standard of care which it would require of the defendants, or either of them." Point 22 reiterates a matter stated in Point 21. Point 31 quotes the following objection: "(11n) Said issue as submitted is vague and indefinite and allows the jury to speculate as to the length of time that said piece of candy remained on the floor of said store, if it did so remain and does not give the jury any guide as to the length

of time that said candy might remain on the floor of said store without requiring the defendant to discover and remove same."

Issue 4 was good against these objections. See: Hopson v. Gulf Oil Corp., Tex.Civ. App., 237 S.W.2d 353, at page 356, et seq. "Ordinary care" was defined and no objection has been made to the definition. The inquiry submitted was the test of liability, and the language used stated this test with sufficient clearness, at least against the objections considered here.

■ Point 39 quotes the following special instruction, requested to be given with Issue 4 but refused: "In connection with special issue No. 4 you are instructed that in cases of the nature before you the storekeeper is not the insurer of the safety of his invited customers but he only owes them the duty to use ordinary care to keep and maintain his premises in a reasonable safe condition for their use. If a dangerous or unsafe condition existed by reason of one piece of candy on the floor this condition must have existed for such length of time prior to the occurrence that the storekeeper, his agents, servants or employees would or should have discovered it by the exercise of reasonable diligence, and the presumption is that the storekeeper exercised due care in the maintenance of its premises and did not permit the candy to remain on the floor a sufficient length of time to permit notice of its presence on the floor to be inferred." This instruction was properly refused.

■ Point 23 repeats the following objection: "(11d) Said issue as submitted submits a mixed question of law and fact to the jury and permits the jury to decide both the law and the facts of this case as to both defendants without at any time requiring the jury to find the fact as to how long said candy, if any, was on the floor of the store." It was not necessary for the jury to find exactly how long the candy had been on the floor, and Issue 4 did not submit a mixed question of law and fact, nor was it multiferous. The proof does not show exactly how long the candy was on the floor and we doubt that this fact could ever have

900

been proved. Whether the candy actually was on the floor had been previously submitted in Issue 2, and Issue 4 was conditioned upon an affirmative answer to Issue 2. Obviously, the prior finding under Issue 2 implied that the defendants had not removed the candy. Issue 4 was expressed in the form which the circumstances required. These comments also dispose of objections quoted in Point 27 and parts of 1 and 3 of Point 29.

(c) Points 26, 27 and parts 1 and 3 of Point 29 have been considered and are overruled.

 (d) Point 28 repeats the following objection: "(11L) Said issue as submitted is erroneous in that it permits an affimative answer to said issue even though the jury should find that H. H. Howe had no agents, servants or employees, and even though the jury should acquit him of negligence, thereby making it impossible for the defendant, H. H. Howe, or in the alternative the defendant, S. H. Kress and Company, to obtain a favorable finding on such issue."

Had the jury believed that Howe had no agents, servants or employees they must necessarily have answered the issue favorably to the defendants. The form of the issue puts a burden on the plaintiffs, not on the defendants.

The issue makes no inquiry about the personal negligence of Howe and the jury could not have convicted or acquitted him of negligence.

Point 29 (Part 2) repeats the following objection: "(2) It assumed that both the defendants, H. H. Howe and S. H. Kress and Company, had agents, servants and employees for whom each of them were individually responsible, whereas the undisputed evidence shows that *H. H. Howe was only the manager* of defendant's store and *employed no agents, servants or employees.*" Point 30 reiterates that "the undisputed evidence shows that *every one employed in said store was an employee of S. H. Kress and Company and * * * Howe was only the manager of said store.*"

The statements italicized are correct; but the defect pointed out was harmless to defendants. Issue 4 inquired only about the "agents, servants and employees" of the defendants; it did not inquire otherwise about Kress and it did not inquire about personal conduct of Howe. The proof showed as a matter of law, just as defendants say here, that Howe was only an intermediate servant, and that he had no "agents, servants or employees" of his own in the store. The jury must have construed the words "agents, servants and employees" as referring to the only ones mentioned in the proof, namely, Howe's subordinates, and therefore neither Howe nor Kress could have been harmed because the finding obviously referred to the conduct of these subordinates. Liability on the finding follows, or not, as a matter of law.

The form of Issue 4 is evidently based upon the legal theory that Howe and Kress were jointly liable for the failure to remove the candy, and that the subordinates were "agents" of both, and the jury must so have construed the issue.

 Points 32 to 35, inclusive, assign error to Issue 5. Points 34 and 35 must be overruled because of holdings made respecting Issue 4. Point 32 repeats the following objection: "(12a) Said issue is not in conformity with the pleadings and there are no pleadings to support the submission of such issue." Both Issue 4 and Issue 5 were supported by the following allegations of negligence, which were alleged to be a proximate cause of Mrs. Selph's injuries: "(4) In allowing said slippery and greasy substance to remain upon said floor; (5) in failing to discover said slippery and greasy substance." In other allegations plaintiffs identified the substance causing Mrs. Selph to fall as candy or other greasy or slippery substance, but in their admissions and in their proof, and in the Special Issues submitted to the jury this substance was definitely identified as candy.

 Point 33 repeats the following objection: "(12c) Said Special Issue No. 5 is not in conformity with the preceding issue, Special Issue No. 4, because it does not submit the issue as to whether the failure to discover said candy was a proximate

cause of plaintiff's alleged injuries." This objection is overruled.

In their argument under Points 32 and 33 the defendants refer to another variance between Issue 5 and Issue 4 but this variance was not complained of in the trial court. It seems to us, on the merits, that this variance did no harm to the defendant Kress and whether it did harm to the defendant Howe is immaterial since we have held that he was not liable to the plaintiffs.

■ Point 36 repeats certain objection to Issue 7. It is overruled. Issue 7 was conditioned upon an affirmative answer to Issue 6 and it was not answered because the answer to Issue 6 was negative. Therefore the matters referred to in the objection quoted in Point 36 could not have done the defendants any harm since the jury never reached Issue 6. No assignment has been directed at Issue 6.

Points 37 and 38 repeat certain objection to Issue 9, which submitted the question of damages.

■ One element of damages submitted was the loss of capacity to work and earn money, and the objection quoted in Point 37 is that according to the proof, Mrs. Selph had been unemployed for a number of years and that the proof showed that she did not intend to enter employment. The proof showed, however, that Mrs. Selph did have the capacity to work and earn money, and she was so engaged when she was hurt; she testified that she had a boarder who paid her $20 per week and that she did this person's washing. We do not understand that the defendants' objected to the evidence concerning loss of capacity on the ground that it was too indefinite to support an award of damages, but we think that it was definite enough to support an award of some damages to the plaintiffs. Loss of or diminution of Mrs. Selph's capacity to work and earn money was compensable in damages whether this capacity was in point or not. Another element of damages submitted was for the pain and suffering of Mrs. Selph, and Point 38 repeats the objection that the evidence does not show that Mrs. Selph would ex-

perience future pain and suffering. However, there is evidence which would justify a finding that she would.

■ Points 40, 41 and 42 assign error to the trial court's refusal to submit special issues requested by the defendants. These points are overruled. The subject matter of the issues quoted in these points was specially pleaded by defendants as contributory negligence by Mrs. Selph. However, Issue 6 of the trial court's charge included the subject matter of all of these issues which defendants requested and the subject matter of Issue 6 was also specially pleaded by defendants as contributory negligence on the part of Mrs. Selph. Issue 6 was also a better statement of the question to be determined by the jury. Thus "failure to inspect the floor" (Requested Issue 5) was too narrow and put too great a burden on the plaintiffs. "Failure to see the candy" (Requested Issue 9) was not as definite as Issue 6 and the same criticism can be made of "failure to exercise ordinary care in walking" (Requested Issue 14). It seems to us that the form of requested Issue 14 is actually misleading. In determining whether Mrs. Selph was negligent regarding any of the matters referred to in these requested issues, it seems to us that the jury would have had to consider and be guided by their determination of the question actually put to the jury in Issue 5, because of the circumstances. Thus Mrs. Selph was expected by defendants to view and consider the merchandise upon the counters which she passed; this merchandise was put there to distract her attention from other things. The jury also could have inferred that other persons were in the aisle and their presence would also affect Mrs. Selph's actions.

■ Point 43 assigns error to the trial court's refusal to submit defendants' requested Issue 9 reading: "What length of time, if any, do you find from a preponderance of the evidence that the piece of candy upon which the said Ida Selph slipped, if you have found that she did slip, remained on the floor of defendants' store?" This point is overruled. The defendants did not

plead the subject matter of this requested issue as a defense and the matter inquired about was immaterial. The jury could not have answered the issue, in fact. The proof does not show exactly how long the candy had been on the floor before Mrs. Selph stepped upon it, although for reasons stated at the beginning of this opinion we think that the jury could have found that this candy had been passed over by the porter and that an exercise of due care by the defendant Kress would have resulted in the removal of the candy before Mrs. Selph arrived at it.

■ Point 44 assigns error to the trial court's refusal to permit defendants to show by Mrs. Selph that she declined to submit to an examination by a physician of the defendants' choice. This point is overruled. The parties' lawyers had previously stipulated in open court defendants had, in due time, requested such an examination and that the plaintiff had denied the request.

■ Under Point 45 defendants say that the award of $8,500 damages was excessive. We have considered the evidence and overrule the point.

■ Points 46 and 47 are overruled. There was evidence from which the trial court could have found that the misconduct of the jury alleged by the defendants did not occur, and since no findings have been filed, we must assume that the trial court so found.

These comments adjudicate the points of error filed by the defendants. The plaintiffs have filed a series of counter-points which assign error to the trial court's order sustaining special exceptions to certain allegations made by them against the defendant Howe. We have previously disposed of counter-points 1, 2, 3, 4, and 8 in our discussion of defendants' Point 5. As regards the matters alleged against Howe, which are referred to in these counter-points, these were not material except as evidence tending to show that Mr. Howe controlled the store and the business conducted in the store, and these facts were proven by Mr. Howe's own testimony. As regards counter-points 5, 6, 7, and 9 the striking of the allegations excepted to by

the defendants did the plaintiffs no harm. There is no evidence that the candy which Mrs. Selph stepped upon came from the top of the candy counter. Rather, since no wrapping or bag is mentioned in the proof, the inference is that some purchaser dropped the candy. There is no evidence that unwrapped candy was displayed on the top of the candy counter, and the photographs in evidence show nothing but candy in containers.

The judgment against S. H. Kress and Company is affirmed, but that against H. H. Howe is reversed and judgment is here rendered in his favor, that plaintiffs take nothing against him.

## On Motions for Rehearing

The appeal is before us on motions for rehearing by both plaintiffs and defendants.

Defendants' motion has been considered and the same is overruled.

Plaintiffs' motion is also overruled. We add these comments: Plaintiffs have cited the decisions in Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853, W. P. Carmichael Co. v. Miller, Tex.Civ.App., 178 S.W. 976 and Cornett v. Hardy, Tex. Civ.App., 241 S.W.2d 186. None of these decisions is in point on the facts as respects the defendant Howe's liability. Henger was not the kind of servant that Howe was. Howe was neither the owner nor the occupant of land; he was an intermediate servant of the occupant. Henger's case seems to be like Fox v. Dallas Hotel Company, 111 Tex. 461, 240 S.W. 517. In Miller's case the foreman sent the workman into the dangerous situation; and in Hardy's case the servant knew of the dangerous condition of the wheel when he requested the plaintiff to put air into the tire. In Lane v. Fair Stores, Inc., Tex., 243 S.W.2d 683 the servant was not a party to the suit.

We agree with plaintiffs that if they could show that the candy on which Mrs. Selph stepped had come from the top of the candy case, then the defendant Howe might be liable for negligence incidental to the way and manner in which candy was displayed on the top of the case. How-

ever, the proof rules out liability on the part of Howe under plaintiffs' allegations Nos. 7 and 8 in paragraph 6 of the amended petition, to which the trial court sustained defendants' exceptions 9(L) and 9(M). The proof shows that Howe did not stack or place the candy and that the people who did this were not his servants or his agents. Allegation No. 10 in paragraph 6 of the amended petition, to which the trial court sustained exception 9(O) might be of some significance, but the particular allegation was incomplete in the respect pointed out in exception 9(O), and this exception was good. This matter of stacking candy had been set out as negligence in a preceding paragraph of the petition, namely, paragraph 4 of Article 4 of the amended petition; but exceptions 5(a) and 5(b) were sustained to this paragraph, and the trial court was authorized to test the sufficiency of allegation 6(10) by the terms of that allegation alone. We note that error has not been assigned to the trial court's action in sustaining exceptions 5(a) and 5(b).